IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

SERENITY LANE, INC. and )
SERENITY LANE HEALTH SERVICES, )
)
Plaintiffs, ) TC-MD 111141N
)
v. )
)
MULTNOMAH COUNTY ASSESSOR, )
)
Defendant. ) **FINAL DECISION**

On July 10, 2014, the court entered its Decision in the above-entitled matter. Plaintiffs filed a Statement for Costs and Disbursements on July 25, 2014. As of the date of this Final Decision, Defendant has not filed a written objection or any other response to Plaintiffs' Statement of Costs and Disbursements. This matter is now ready for the court's Final Decision. The court's Final Decision incorporates its Decision without change and includes the court's analysis and determination of Plaintiffs' request for costs and disbursements in section III.

Plaintiffs appeal Defendant's exemption denial letter dated September 19, 2011, for the 2011-12 tax year. A trial was held in the Oregon Tax Courtroom on June 3, 2014, in Salem, Oregon. Dennis W. Percell, Attorney at Law, appeared on behalf of Plaintiffs. Mike Dyer (Dyer), President and CEO of Serenity Lane, and Ed Whitelaw (Whitelaw), ECO Northwest Consultant and University of Oregon Professor Emeritus of Economics, testified on behalf of Plaintiffs. Lindsay R. Kandra, Assistant County Attorney, appeared on behalf of Defendant. Plaintiffs' Exhibits 1 to12 were received without objection. Plaintiffs offered exhibits that were not timely exchanged under Tax Court Rule-Magistrate Division 10 C. Defendant objected to and the court excluded those exhibits. Defendant did not offer any exhibits.

/ / /

## I. STATEMENT OF FACTS

Dyer testified that Plaintiffs operate nine outpatient facilities in Oregon, one of which is the subject property located on Barbur Boulevard in Portland. (Ptfs' Ex 12 at 2.) He testified that the subject property is owned by Serenity Lane Health Services, a real estate holding company, and leased to Serenity Lane, Inc., an addiction treatment service provider. (Ptfs' Ex 7.) Dyer testified that Plaintiffs provide addiction treatment services including a 21- or 28-day residential treatment program, an "Intensive Outpatient" treatment program, "Medically Managed Withdrawal (detox)," and a "Recovery Support" program. (Ptfs' Ex 12 at 1-2.) He testified that the residential treatment and detox programs are available only at Plaintiffs' Eugene facility. Plaintiffs' brochure states that admission to the detox and residential programs at the Eugene facility "can be coordinated through the Portland Clinics." (Ptfs' Ex 12 at 1.) Dyer testified that intensive outpatient treatment is available at all of Plaintiffs' facilities. He testified that, depending on the patient's needs, a patient may receive intensive outpatient treatment following residential treatment or may receive intensive outpatient treatment only. Dyer testified that intensive outpatient treatment is nine hours per week for 10 weeks. He testified that Recovery Support is available to all patients who complete intensive outpatient treatment. Dyer testified that Recovery Support is 1.5 hours per week for up to one year and nine months.[1]

Dyer testified that the "vast majority" of services provided at the subject property are intensive outpatient treatment. He testified that DUII services[2] and employee counseling services are also provided at the subject property. (*See* Ptfs' Ex 12.) Dyer testified that Plaintiffs

---

[1] Plaintiffs' brochure states that recovery support is available for up to 11 months. (Ptfs' Ex 12 at 2.)

[2] DUII is an acronym for "driving under the influence of intoxicants."

provide a "physician webcam" service in coordination with their Eugene facility whereby patients at the subject property facility can receive a prescription from one of the Eugene facility physicians if needed. Dyer testified that Plaintiffs provide intake assessments at the subject property facility, about 90 percent of which are free. He testified that Plaintiffs only charge for assessments when they are employer-mandated or medical assessments. Dyer testified that assessments take 1.5 hours and the charge, if any, is $275 per assessment. He testified that the assessment revenue from the subject property in the 2011-12 tax year was $9,600, whereas he estimated that at least 350 assessments were performed given that 173 patients were admitted at the subject property in the 2011-12 tax year.

Dyer testified that intensive outpatient and recovery support services are provided by Certified Drug and Alcohol Counselors (CADCs). He testified that the subject property facility was staffed by a clinic manager, about six CADCs, and several administrative staff. Dyer testified that Plaintiffs' rate for intensive outpatient treatment during the 2011-12 tax year was $4,860 per person, or $54 per hour. He testified that rate was the same during the 2010-11 tax year. Dyer testified that, in 2011, Plaintiffs commissioned a study of like-type services to determine the market rate for its services.[3] He testified that, based on that survey, Plaintiffs' rate for intensive outpatient treatment of $54 per hour was at or below the market rate.

Plaintiffs reported "net patient revenues" of $13,089,289 for the 2011-12 tax year. (Ptfs' Ex 8 at 1.) Dyer testified that the total gross income from the subject property for the 2011-12 tax year was $777,368, although that included a $98,500 account credit, therefore, the true gross income was $678,868. He testified that the subject property incurred a net loss of

/ / /

---

[3] Whitelaw testified that that study was completed by one of his colleagues at ECO Northwest and submitted as an exhibit in Plaintiffs' 2010-11 tax year appeal. He testified that he reviewed the report.

$70,933 in the 2011-12 tax year. Dyer testified that all of Plaintiffs' revenue is reinvested back into its operations, of which salaries and wages are the largest expense.

Plaintiffs reported total "recorded charity care" of $369,947, or 2.8 percent of net revenue, in the fiscal year ending March 31, 2012. (Ptfs' Ex 9 at 1.) Dyer testified that Plaintiffs annually allocate to each of their regional facilities a fixed amount for financial aid or "charity care." He testified that Plaintiffs allocated $20,000 to the subject property facility in the 2011-12 tax year. Dyer testified that facility managers may request additional aid for patients on a case by case basis. He testified that Plaintiffs consider patients' ability to pay in determining the amount of aid to provide. Dyer testified that, in the 2011-12 tax year, 13 patients at the subject property facility received financial aid for total aid of $36,863.37. (*See generally* Ptfs' Ex 9 at 2-13 (listing charity care provided at each facility).) On cross-examination, Dyer testified that several of the charity care accounts reported for the Portland facility were patients who also received services at the Eugene facility; thus, the total charity care allocable to the Portland facility is less than $36,863.37, although the precise amount is unclear.[4] (*See id.* at 2-3, 8-9.)

Dyer testified that, in the 2011-12 tax year, Plaintiffs provided 5,354 hours of Recovery Support services at the subject property facility at no charge. He testified that the total value of those services was $289,116, based on the hourly rate of $54 per hour. Dyer testified that he was not aware of any other Oregon substance abuse treatment programs that provided free recovery support. He testified that Plaintiffs are charged $50 for urine analysis.

Plaintiffs reported treating 99 Oregon Health Plan (OHP) patients, or 6.3 percent of all hospital patients, for a total OHP discount value of $87,612 in the fiscal year ending March 31,

---

[4] For example, Account 125121 received charity care with a value of $6,810 on June 17, 2011. (Ptfs' Ex 9 at 2.) That account was identified as "Portland," but the services received were "DTX RESI IOP." (*Id.* at 8.) Dyer testified that residential and detox treatment services are not provided at the Portland facility and must, therefore, have been provided at the Eugene facility.

2012. (Ptfs' Ex 11 at 1.) Dyer testified that OHP patients did not receive services at the subject property facility because, unlike in Lane County, Plaintiffs did not have a contract to provide detox services to OHP patients in Multnomah County. Dyer testified that Plaintiffs' "New Hope" program did not operate in Multnomah County, only in Lane County.[5] Dyer testified that Plaintiffs' intern training program did not operate in Multnomah County, only in Lane County.[6]

## II. ANALYSIS

The issue before the court is whether the subject property is entitled to property tax exemption for the 2011-12 tax year under ORS 307.130.[7]

ORS 307.130(2) exempts from taxation certain real or personal property, or portion thereof, owned or being purchased by incorporated charitable institutions.[8] The property must be "actually and exclusively occupied or used in the * * * charitable * * * work carried on by such institutions." ORS 307.130(2)(a). To determine if the organization qualifies as a "charitable institution" under ORS 307.130(2), this court must consider the three requirements set forth in *SW Oregon Pub. Def. Services v. Dept. of Rev.* (*SW Oregon*):

---

[5] Plaintiffs' " 'New Hope' program exists to offer treatment options for indigent and low-income individuals. It is housed out of a facility separate from [Plaintiffs'] downtown residential treatment facility. The testimony at trial was to the effect that [plaintiffs] typically serve[] patients who have insurance through the Oregon Health Plan through the New Hope program, but also look[] for other signs of acute financial distress, such as reliance on food stamps." *Serenity Lane, Inc. v. Lane County Assessor* (*Serenity Lane*), 21 OTR 229, 232 (2013).

[6] Plaintiffs "sponsor[ed] an internship program to train aspiring addiction counselors. [Plaintiffs] host[] ten interns per year in a program aimed at achieving the training necessary for certification as a [CADC]. The interns do not pay for this training, and are given a stipend to help defray living expenses while involved with the program." *Serenity Lane*, 21 OTR at 232.

[7] The court's references to the Oregon Revised Statutes (ORS) are to 2009.

[8] Here, as in *Serenity Lane*, a potential problem results from the fact that Plaintiffs are two distinct legal entities, only one of which owned the property at issue. *See* 21 OTR at 234. Under ORS 307.166(1), leased property may qualify for property tax exemption if both the lessor and lessee institutions qualify for property tax exemption under ORS chapter 307 and "the lessee institution uses the property in the manner required under the statute that would entitle that lessee institution to claim exemption for the property if it owned the property." *Id.* The court in *Serenity Lane* looked at the plaintiffs' "overall operation as if it were one allegedly charitable institution." *Id.* at 235. The court follows the same approach in this appeal.

(1)     "Charity as the organization's 'primary, if not sole, object';

(2)     "The organization's operations must serve the charitable mission of the organization; and

(3)      "The presence of an element of 'gift or giving' in the activities of the organization."

*Serenity Lane, Inc. v. Lane County Assessor* (*Serenity Lane*), 21 OTR 229, 235 (2013), citing *SW Oregon*, 312 Or 82, 89, 812 P2d 1292 (1991).

This court concluded that, for the 2010-11 tax year, the plaintiffs qualified as "charitable institutions" for purposes of ORS 307.130(2). *Serenity Lane*, 21 OTR at 244. The defendant in that case did not dispute that the property at issue, the plaintiffs' facility in Eugene, was actually and exclusively used in the plaintiffs' charitable work; rather, the defendant asserted that the plaintiffs did not satisfy the requirement of "gift or giving" to be a charitable institution. *Id.* at 230. The court granted the plaintiffs' appeal because the plaintiffs were charitable institutions. *Id.* at 244.

This appeal involves property in Multnomah County and was filed for the 2011-12 tax year. As the court understands Defendant's position in this case, Defendant does not assert that Plaintiffs failed to qualify as charitable institutions for the 2011-12 tax year; rather, Defendant asserts that the subject property does not qualify for property tax exemption because Plaintiffs' operations at the subject property do not involve sufficient "gift and giving" under the *SW Oregon* test. (Def's Closing Arg at 4.) Plaintiffs disagree that the subject property must separately satisfy the "gift and giving" requirement under *SW Oregon* because Plaintiffs are "charitable institutions" under ORS 307.130(2). (Ptfs' Closing Arg Br at 2-3.)

Although it was not clearly challenged by Defendant, the court will briefly address whether Plaintiffs qualified as "charitable institutions" under ORS 307.130(2) for the 2011-12

tax year. In *Serenity Lane*, this court reviewed numerous aspects of the plaintiffs' operations that have been identified by this court in past decisions as factors tending to indicate the presence of "gift or giving." *See* 21 OTR at 236-43. The court found several factors weighed in favor of the plaintiffs, including: the plaintiffs' application of its receipts to upkeep, maintenance, and equipment; the plaintiffs' nondiscrimination based on race, color, or creed; the plaintiffs' provision of services to the "rich and poor alike"; the plaintiffs' "system of 'scholarship' giving based on need; the plaintiffs' provision of addiction treatment programs at "substantially less than the market rate"; the plaintiffs' internship program; and the plaintiffs' community outreach activities. *Id.* Based on the evidence submitted by Plaintiffs at trial in this case, the court concludes that Plaintiffs' overall operations in the 2011-12 tax year were the same or substantially similar to their operations in the 2010-11 tax year and Plaintiffs qualified as "charitable institutions" under ORS 307.130(2) for the 2011-12 tax year.

The remaining issue in this case is whether the subject property was "actually and exclusively occupied or used" in Plaintiffs' charitable work. The parties disagree on the proper application of that test. Plaintiffs argue that the court should look to *Mercy Medical Center, Inc. v. Dept. of Rev.* (*Mercy Medical*), 12 OTR 305, 307 (1992), in which this court held that the *SW Oregon* tests are "applied to an organization overall and not to any specific part or operation." (Ptfs' Closing Arg Br at 2-3.) In *Mercy Medical*, the court explained that, because defendant conceded that the plaintiff hospital was a charitable organization,

> "there [was] no need to apply the three-part test [in *SW Oregon*]. Consequently, defendant's arguments with regard to the absence of a gift or giving in the operation of the gift shop [the property at issue] are irrelevant. If plaintiff's hospital is charitable overall, the fact that some portion of its operation makes a profit is immaterial. It is also immaterial that the operation of the gift shop competes with taxable businesses."

*Id.* at 307-08, citing *YMCA v. Dept. of Rev.* (*YMCA*), 268 Or 633, 635, 522 P2d 464 (1974).

Citing *YMCA v. Dept. of Rev.* (*YMCA of Columbia-Willamette*), 308 Or 644, 655, 784 P2d 1086 (1989), Defendant argues that, when a charitable institution owns multiple properties, "each specific property * * * must be charitable." (Def's Closing Arg at 3 (emphasis in original).) In essence, Defendant argues that each specific property must satisfy the "gift and giving" requirement of the *SW Oregon* test.[9] (*See id.* at 3-4.) In *YMCA of Columbia-Willamette*, the Oregon Supreme Court denied property tax exemption for two fitness centers operated by the plaintiff. 308 Or at 647, 659. The question presented was whether the two fitness centers were actually and exclusively occupied or used in the charitable work carried on by the plaintiff. *Id.* at 649. The court in *YMCA of Columbia-Willamette* considered several arguments advanced by the plaintiff, including an argument based on the level of "scholarship giving" at the two facilities at issue and an argument based on the average level of "charitable giving" at plaintiff's multiple facilities. *Id.* at 653, 655.

Although the court in *YMCA of Columbia-Willamette* considered the plaintiff's charitable giving, it did so in response to arguments advanced by the plaintiff and did not indicate that such analysis was required in order to determine if property owned or being purchased by a charitable institution should be exempt from property taxation. Implicit in the court's rejection of the plaintiff's arguments was the court's conclusion that the two fitness centers were not used in the plaintiff's charitable work. *See, e.g., YMCA of Columbia-Willamette*, 308 Or at 655 (holding that the plaintiff's "remaining property, not so used" for the plaintiff's charitable work did not qualify for exemption even though the income derived from the property was used to support the plaintiff's charitable work). In other words, the level of giving at a specific property owned or

___

[9] *YMCA of Columbia-Willamette* was decided two years prior to *SW Oregon*, so the court in *YMCA of Columbia-Willamette* could not have addressed whether the three-part test in *SW Oregon* is applied to each property owned by a charitable institution.

being purchased by a charitable institution may be a relevant consideration, but there is no requirement that the operations at each such property involve a level of charitable giving to separately qualify that property for exemption. Property qualifies for exemption if it is " 'exclusively used' by plaintiff in accomplishing its charitable goals" and " 'substantially contribute[s]' to furthering those goals." *Mercy Medical*, 12 OTR at 308.

That point is illustrated by the decision in *YMCA*, in which the Oregon Supreme Court granted property tax exemption for a kitchen and cafeteria, "property used to house Selective Service draftees," and "property rented to the Job Corps for office space and recreation." 268 Or at 634-37, 639. The court sought to determine whether each of those properties was used to implement the plaintiff's charitable goals "in a substantial way" and was, therefore, entitled to exemption. *Id.* at 634-35. The court concluded that the plaintiff's kitchen and cafeteria facilities qualified for property tax exemption because "the availability of the food service facilitated the use of the Y.M.C.A. for recreational purposes and made it more convenient for those engaged in Y.M.C.A. projects to attend meetings, a factor of importance in an organization largely dependent upon volunteer businessmen in shaping its programs. The food operation was also used as a job training facility for handicapped individuals." *Id.* at 634, 635-36. The court allowed an exemption for "property used to house Selective Service draftees[,]" noting that the plaintiff received the government contract in part because it "had a staff that had a high degree of training working with young men." *Id.* at 634, 636-37. The court allowed an exemption for "property rented to the Job Corps for office space and recreation[,]" finding that the Job Corps' activity "was interrelated with the entire Y.M.C.A. program for the Job Corps trainees" and it was "within the scope of the charitable objectives of the Y.M.C.A." *Id.* at 634-35, 639.

/ / /

It is clear under *YMCA* that the court's analysis must focus on whether use of the subject property contributes "in a substantial way" to Plaintiffs' charitable goal.[10] "[T]he court must determine what role the use of the property plays in the institution's accomplishment of its charitable purposes. This determination must focus on the relationship of the activity or use to the institution's exempt purposes." *Mercy Medical*, 12 OTR at 309. If the subject property does not contribute in a substantial way to Plaintiffs' charitable goal, then the subject property does not qualify for exemption unless it otherwise qualifies under another provision of law.

The court begins by identifying Plaintiffs' charitable goal. In *Serenity Lane*, this court found that the plaintiffs' "sole purpose" as an organization was "to operate addiction treatment programs on a not-for-profit basis." 21 OTR at 235. That finding is supported by Plaintiff Serenity Lane, Inc.'s Articles of Incorporation. (*See* Ptfs' Ex 1 at 1.) The first question is whether the subject property was "exclusively used" by Plaintiffs in accomplishing their charitable goal. *Mercy Medical*, 12 OTR at 308. The court is persuaded that it was so used. The subject property was used by Plaintiffs to provide addiction treatment services; it was not used by any other organization or for any other purpose.

The next question is whether the subject property "substantially contributes" to Plaintiffs' charitable goal. *Mercy Medical*, 12 OTR at 308. Although Plaintiffs did not use the subject property to provide their full array of charitable services, the court concludes that Plaintiffs' use of the subject property was within the scope of Plaintiffs' charitable goal and that the subject

---

[10] The case law of the Oregon Supreme Court and this court is replete with examples of this analysis. *See, e.g., Mult. School of Bible v. Mult. Co.*, 218 Or 19, 37, 343 P2d 893 (1959) (granting exemption for a campus residence occupied by the school's superintendent and his wife and by the school's dining hall supervisor); *Lewis & Clark College v. Commission*, 3 OTR 429 (1969) (granting exemption for a house provided to the university president, where sufficient evidence was presented that the house was frequently used in service of the university); *Blanchet House of Hospitality v. Multnomah County Assessor*, TC-MD No 130503C, WL 2535130 at *3, *6 (June 5, 2014) (granting exemption for two floors of a building used for "storage of food items and other goods and supplies" used in the plaintiff's charitable work).

property was operated in a manner that substantially contributed to Plaintiffs' charitable goal. Plaintiffs' "operational hub" was located in Eugene[11] and the subject property was part of Plaintiffs' network of facilities around the state. Plaintiffs' activities at the subject property facility were integrated with its activities at the Eugene facility. For example, Dyer testified that Plaintiffs conducted intake at the subject property facility and, when necessary, referred patients to the residential program in Eugene. He testified that, following residential treatment at the Eugene facility, Plaintiffs provided intensive outpatient treatment and recovery support at the subject property facility. As another example of the integration between the subject property facility and Plaintiffs' Eugene facility, Dyer testified that patients at the subject property could be connected via webcam to a physician in Eugene.

In prior decisions, this court has concluded that a property operated in conjunction with and in support of the charitable institution's primary facility qualifies for property tax exemption. In *Willamette Falls Hosp. v. Clackamas County Assessor*, TC-MD No 090791B (control), WL 1196791 at *2, *7 (Mar 30, 2011), this court granted property tax exemption for personal property used at the plaintiff's diagnostic imaging (DI) facility located in Canby, a "satellite location" of the plaintiff. The court noted the following facts in support of that conclusion:

> "Plaintiff considered the Canby DI facility part of Plaintiff's hospital, that the staff at the Canby DI facility were Plaintiff's employees, that much of the administration of the Canby DI clinic actually took place from Plaintiff's Oregon City campus, and that the Canby DI facility operated under the same rules as any other part of Plaintiff's hospital. Blanchard testified that the Canby DI facility contributes to, and is funded from, the revenues of Plaintiff's hospital."

*Id.* at *6. Similarly, in *Goodwill Industries of Columbia Willamette, Inc. v. Benton County Assessor*, TC-MD No 060676D, WL 1168679 at *1 (Apr 18, 2007), this court granted a partial exemption for a donation collection site operated by the plaintiff, a charitable organization with

---

[11] *See Serenity Lane*, 21 OTR at 230.

the purpose of "provid[ing] vocational opportunities to people with barriers to employment" that collected and sold donated goods at its retail locations. (Internal quotation marks omitted.) The court reasoned "that the donation site under appeal is 'incidental to and reasonably necessary for the accomplishment of [the plaintiff's charitable] purposes.' " *Id.* at \*6 (citation omitted).

As in those cases, the subject property is integrated into Plaintiffs' overall operations and is reasonably necessary to the accomplishment of Plaintiffs' charitable goal.

### III. COSTS AND DISBURSEMENTS ANALYSIS

The Magistrate Division has discretionary authority under ORS 305.490(2) to award costs and disbursement to the prevailing party. *Wihtol I v. Dept. of Rev.*, 21 OTR 260, 267-68 (2013). The Magistrate Division has promulgated a rule, Tax Court Rule-Magistrate Division (TCR-MD) 19, that sets forth the procedure for a prevailing party to request costs and disbursements. TCR-MD 19 C(1) states, in pertinent part, that "[a] party seeking costs and disbursements shall, not later than 14 days after the entry of a magistrate's decision, file with the court and provide a copy to the other parties a signed and detailed statement of costs and disbursements."

The Decision in this matter was entered on July 10, 2014. Plaintiffs' Statement for Costs and Disbursements was filed by the court on July 25, 2014, which is more than 14 days after the Decision was entered. However, Plaintiffs' Certificate of Service states that the Statement for Costs and Disbursements was sent through the United States mail on July 23, 2014.[12] Tax Court Rule (TCR) 9 E provides the applicable definition of filing with the court: "Pleadings and other documents are filed with the court when the court endorses or stamps upon such pleading or

---

[12] In some instances, a document is considered filed on the date it is mailed. *See, e.g.,* ORS 305.418(1) (complaint "[t]ransmitted through the United States mail" to Oregon Tax Court deemed filed "on the date shown by the post-office cancellation mark stamped upon the envelope containing it").

FINAL DECISION  TC-MD 111141N 12

document the time of day, the day of the month, the month, and the year." [13]  Plaintiffs' request for costs and disbursements was not filed within the time allowed under TCR-MD 19 C(1) and should, therefore, be denied.

## IV.  CONCLUSION

After careful consideration, the court concludes that, for the 2011-12 tax year, Plaintiffs qualified as "charitable institutions" and the subject property was "actually and exclusively" used by Plaintiffs in their charitable work.  The subject property is, therefore, entitled to property tax exemption under ORS 307.130(2)(a) for the 2011-12 tax year.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is granted.

IT IS FURTHER DECIDED that Plaintiffs' requests for costs and disbursements is denied because it was not filed within the time allowed under TCR-MD 19 C(1).

Dated this ____ day of August 2014.


_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Allison R. Boomer on August 8, 2014. The court filed and entered this document on August 8, 2014.*

---

[13] TCR 9 is made applicable through the Preface to the Magistrate Division Rules and TCR-MD 5.  The Preface to the Magistrate Division Rules states, in pertinent part, that "[i]f circumstances arise that are not covered by a Magistrate Division rule, rules of the Regular Division of the Tax Court may be used as a guide to the extent relevant."  TCR-MD 5, which is the Magistrate Division's rule on service, specifically states that "TCR 9 may be used as a guide to the extent relevant."